## H.  B.  MILLER  v.  F.  SCHMULLEN.

1. An assignment as error that "the verdict is contrary to the law and the "evidence" fails to comply with the twenty-second rule of this court, which requires that the errors complained of be specifically pointed out. (32 Texas, 812.)   The motion for a new trial was equally indefinite in this case.   .
2. Under our system a certain sanctity is ascribed to the verdicts of juries on questions of fact, which cannot be disregarded by the courts.

ERROR from Calhoun.    Tried below before the Hon. T. C. Barden.

This suit was brought by Fannie Schmullen against Henry B. Miller, as sheriff of Calhoun county, for the seizure of certain goods, wares, and merchandise, claiming damages in the sum of five thousand dollars.    The case was tried at the May

Term, 1871; verdict and judgment for three thousand five hundred dollars for plaintiff; motion for a new trial overruled, and the case brought to this court on writ of error.

The defense set up below by Miller in his answer was, that he seized and attached the goods in question by virtue of a writ of attachment issued out of the District Court of Calhoun county in the case of Leon Blum against Joseph Levy; that the goods had been sold by order of the court, and the proceeds paid over to Leon Blum, on a judgment in his favor in said suit of attachment, all of which was in proof by the record.

Miller also set up in his answer that the goods seized and attached had been transferred and sold by Levy to Schmullen, for the purpose of hindering, delaying, and defrauding Levy's creditors; that Levy and Schmullen had confederated together for the purpose of defrauding the said Leon Blum; that at the time of said fraudulent transfer Levy was utterly insolvent; that Levy purchased from Leon Blum, in September, 1869, about three thousand five hundred dollars worth of goods on a credit of thirty, sixty, and ninety days, and that, in less than thirty days thereafter, he made the fraudulent sale of the same goods to Schmullen.

*George P. Finlay*, for the plaintiff in error. " He is not a " purchaser in good faith who knows and assents to the design " to defraud creditors, or who might have known by the exer- " cise of ordinary diligence." (Garahy *v.* Bayley & Co., 25 Texas Rep., 294.)

"A purchase of property, with knowledge that the vendor is " selling to hinder, delay, or defraud his creditors, although for " a valuable and adequate consideration, is void as against " creditors." (Walcott *v.* Brander *et al.*, 10 Texas Rep., 419; Edrington *v.* Rogers *et al.*, 15 Texas Rep., 188.)

"A purchase of property, with knowledge that the vendor " is selling to delay, hinder, or defraud creditors, is void, not- " withstanding that value be paid by the vendor."

" A debtor has a right to prefer one creditor before another;

"but if the preference is made by the transfer of property, and "another creditor contests its validity, and alleges that the "transfer was made to hinder and delay creditors, the preferred "creditor must disprove the charge of fraud by evidence of the "existence in fact of the prior indebtedness to him; proof of "the note, mortgage, etc., is not sufficient." (Mosely v. Gainer, 10 Texas Rep., 393.)

"Other evidence than that of the vendor of the pre-existing "debt ought to have been produced." (Gibson v. Hill, 23 Texas Rep., 83.)

"Where a creditor shows facts that raise a strong presump- "tion of fraud in a conveyance made by his debtor, the history "of which is necessarily known to the debtor only, the burden "of proof lies on him to explain it, his estate being insolvent." (Clements v. Moore, 6 Wallace, 299.)

"A sale of personal property, made much below its cost, by "a man indebted to near or quite the extent of all he had, set "aside as a fraud on creditors; it having been made within a "month after the property was bought, and before it was yet "paid for." (Kempner v. Churchill, 8 Wallace, 362.)

"A conveyance, even for a valuable consideration, is not valid "in point of law from that circumstance alone. It must also be "*bona fide;* for if it be made with intent to defraud and defeat "creditors, it will be void, although there may, in the strictest "sense, be a valuable, nay, an adequate consideration. This "doctrine was laid down in Twyne's case." (Story's Equity, paragraph 369.)

In addition to the above authorities, we refer to the Statute of Frauds, Section 2, which is analogous to 13 Elizabeth, and to the universal doctrine laid down by all the writers, that in a sale of property insolvency is a badge of fraud.

The evidence shows that the relations between Levy and Schmullen were of the most intimate character, the latter living in the same family, eating at the same table, and selling goods behind the same counter for two or three years; that Schmullen's husband, at the time of his death, in 1867, was a

partner of Levy, and that the general business, to all appearances, was conducted as if there never had been any dissolution of the partnership; that Schmullen was the sister-in-law of Levy, and in a position where, by the least diligence, she might have ascertained the insolvency of Levy, and that she must have known and combined with him in the frauds charged against him. The further fact that Levy purchased the identical goods fraudulently transferred to Schmullen within thirty days from the date of the fraudulent transfer; that Schmullen told Burr, a witness for defendant, that Levy had promised her, before he purchased his fall stock in 1869, " that he would pay " her either in money or goods on his return from Galveston," and that Levy told Burr, in the . presence of Mrs. Schmullen, " that it was all in the family," goes to show, beyond a reasonable doubt, that there was a combination between Levy and Schmullen to defraud whomsoever Levy might be fortunate enough to purchase goods from on a credit. If Levy was truly indebted to Schmullen, and promised to pay her " either in " money or goods " on his return from Galveston, it is evident that it was the intention of both parties that Levy should make a raise by purchasing goods on a credit, and pay them or their proceeds to Schmullen; for if he intended to purchase them for cash, he might as well have paid her the cash before he went to Galveston; and such would have been the course of honest, fair dealing. This case is identical with the case of Garahy v. Bayley (25 Sup. Texas Rep., 294), in which the court says: " He is not a purchaser in good faith who knows and assents " to the design to defraud creditors, or who might have known " by the exercise of ordinary diligence."

It also appears from the evidence that at the time Levy purchased the goods from Blum, in September, 1869, that he purchased other large quantities of goods from other parties in Galveston, amounting in the aggregate to six or eight thousand dollars, on a credit, and that he has never paid one cent of this indebtedness. Mr. Proctor, of counsel for defendant in error, testifies that he obtained three several judgments in the Cal-

houn District Court for large amounts, of which he has never collected a cent. Thus we find that Levy purchased in September, 1869, six or eight thousand dollars worth of goods in Galveston, and within one month he transfers to Mrs. Schmullen his entire stock for about three thousand dollars. The question naturally arises, what has become of the balance of the goods purchased? Where is the four or five thousand dollars worth of goods over and above that he purchased? He has paid no debts. He and Mrs. Schmullen are found in the same store, eating at the same table, selling goods at the same counter, but, lo and behold, the goods have disappeared! What a sad commentary upon human weakness, not to say human depravity, that the law should be invoked to cover so much fraud!

Mr. Foote, the Deputy Sheriff, testifies that when he was levying upon the goods in question, some party claimed to have purchased a few articles levied upon, Levy and Mrs. Schmullen being present, whereupon Levy went to the drawer and refunded him the money. How is this? Is Lévy acting as clerk? or is he still one of the proprietors? Is this a badge of fraud, or not?

Taking it for granted, from the facts, that Schmullen participated in the knowledge of these frauds, or at least in the fraudulent intent of Levy, then it devolves upon her to prove her antecedent debt—to prove it, whether she had a knowledge of the fraudulent intent or not. How does she prove it? One Mr. Lemen, who the evidence shows is now in business with Levy, testifies that he heard Levy acknowledge that he owed Schmullen two thousand five hundred dollars. Owed how? For what? When was it contracted? How does this proof come up to the requirements in Mosely v. Gainer, before quoted?

Mrs. Schmullen also introduces three or four distinguished gentlemen (who, for the present, are nameless), who seemed to have formed themselves into a committee of condolence, to prove that Mrs. Schmullen had told them that Levy was in

debt to her in a large amount, but what amount they fail to remember. The Supreme Court says, in Gibson v. Hill: "If "the debt was a *bona fide* one, that fact could easily have been "shown more satisfactorily than by the testimony of the vendor "of the property, and other evidence that such a debt existed "ought to have been produced."

If the goods have been fairly sold under authority of law, the amount realized by the sale will ordinarily be taken as their value. (2 Greenleaf's Evid., Section 649.)

A ministerial officer, acting in good faith, is liable for compensatory damages only. (12 Curtis, Sup. Court Rep., p. 26.)

In cases of civil injury, where there is no element of fraud or malice, the measure of damages is simple compensation only. (Smith v. Sherwood, 2 Texas Rep., 460.)

The verdict and judgment in this case is for three thousand five hundred dollars; now, in case that the plaintiff in error is responsible at all, under the doctrine laid down in Greenleaf, he would only be liable for the amount the goods sold for, as appears from his return of the sale under the writ of attachment and order of sale, which is about two thousand dollars or a little more (the return not being before us, we have not the exact figures). The proof shows that the sale was fairly made, in accordance with law, and for a fair price.

The witness (Milby) who made the invoice in the pretended sale, only proves on trial goods to the value of about two thousand five hundred dollars.

The damages are excessive by the strictest rule of compensatory damages, when viewed under the testimony.

Whilst it is a rule of law that fraud must be proven, the best of jurists must admit that, taken in its literal sense, it would be an impossibility. If the evidence will satisfy an unprejudiced mind that there is fraud in the transaction, brought to the knowledge of the parties, the law will be satisfied. As a naked proposition, fraud cannot be proven, but certain badges and indices of fraud can make the conviction in the mind as strong as truth itself.

It is a lamentable fact, that cases of the most transparent fraud have been concocted and carried out to a successful result, sanctioned by the verdict of juries, when the moral sense of whole communities has been startled and shocked at the enormities which apparently have no remedy. It seems to us, that it is the province of appellate courts, poised upon a pedestal high above the passions and prejudices of ordinary mortals, to scan with enlightened vision the motives of men, and by a logical grouping of incidents and circumstances, bring to judgment the craftiness and corrupt acts of designing and dishonest tradesmen. It is a matter of congratulation that, in the history of Texan jurisprudence, our appellate courts have uniformly thrown the protecting arm around the victims of fraudulent combinations, and taught the juries of our country, by repeated reversals, that he who would approach the fountain of justice must come with clean hands.

We respectfully submit that the present case smells strongly of fraud, and whilst we are imbued with that native sensibility and delicacy towards woman, which is the characteristic of gentle blood, we must reluctantly perform our professional duty in arraigning the motives of one of this class, who, under other circumstances, would claim and receive our deepest sympathy. *Fiat justitia ruat cœlum.*

*Hancock & West,* for the defendant in error.

WALKER, J. This was an action brought by the defendant in error against Miller, the sheriff of Calhoun county, claiming damages for the unlawful seizure and sale of a stock of goods. The goods were sold at the suit of Leon Blum against Joseph Levy. Mrs. Schmullen claimed the goods under a sale from Levy.

We are by no means certain that justice has been done in this case. The evidence is conflicting, and the transaction is open to suspicion of fraud; but nothing is urged against the rulings or charge of the court.

The assignments of errors are not in compliance with the twenty-second rule of practice in this court. The first assignment is, that the verdict is contrary to law and evidence; the why and the wherefore should follow this assignment.

The second assignment is that the damages were excessive. This may be true, but the decision of the jury must be our guide upon the facts.

The third assignment is to the overruling of a motion for a new trial, and is probably predicated upon the other two assignments.

Juries are composed of men, and, like all other men, are fallible; but, under our system, a certain sanctity is given to their decisions on questions of fact, which cannot now be disregarded without some legislative assistance, or an entire overruling of previous decisions.

The judgment of the District Court must be affirmed.

Affirmed.